**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 1:16-cv-01763-DDD-MEH

ESTATE OF PAUL CASTAWAY, by and through Lillian Castaway
a/k/a Lynn Eagle Feather,

     Plaintiff,

v.

MICHAEL TRAUDT,

     Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT

---

After threatening and injuring his mother with a knife, Paul Castaway fled to a nearby neighborhood where he was chased by Defendant Denver Police Officer Michael Traudt. When Mr. Castaway turned, walked toward Officer Traudt and refused to drop the knife, Officer Traudt shot and killed him. Mr. Castaway's estate brought suit, and the sole remaining claim alleges unconstitutional use of deadly force in violation of the Fourth Amendment. Before the Court is Officer Traudt's motion for summary judgment on qualified immunity grounds. Because the Plaintiff has not shown a violation of Mr. Castaway's clearly established constitutional rights under the facts of this case, the Court **GRANTS** the motion.

## BACKGROUND

Viewed in the light most favorable to the Plaintiff, the record shows the following.[1] On July 12, 2015, Paul Castaway attacked his

---

[1]    Plaintiff has not, contrary to the Court's Civil Practice Standards, addressed Defendant's fact statement with the required "Response to

mother, Lynn Eagle Feather, at her home by placing a knife to her throat, causing her to flee to the nearby Denver Indian Center on Morrison Road. Defendant Officer Michael Traudt and Officer Jerry Lara, who were partnered that day, were dispatched to respond. As the officers were on their way, the dispatcher described the incident as a "stabbing" because the knife had broken Ms. Eagle Feather's skin.

When the officers arrived at the Indian Center, Ms. Eagle Feather showed them a small, but visible, puncture wound on her neck. She told the officers that Mr. Castaway entered her apartment without her permission, appeared to be drunk or high and extremely angry, poked her in the throat with a knife, and threatened her life and the lives of her two young grandchildren who were with her. She also told Officers Lara and Tradut she was "scared to death" of her son and "afraid that he [was] going to take [her] life"; he was mentally ill, on drugs, and an alcoholic; he had previously assaulted her; and he needed to go to prison to get help "before he hurts somebody else." Ms. Eagle Feather told the officers that Mr. Castaway might still be in her apartment.

Upon entering Mr. Castaway's information into a law enforcement computer database, the officers learned that Ms. Eagle Feather

---

Statement of Undisputed Material Facts." *See* DDD Civ. P.S. III.E.1.d. Rather, he accepts, for the sake of argument, that certain facts, as presented by Defendant, are not disputed. (*See* Doc. 89, at 5, 8, 10.) He also hasn't supplied evidentiary support for any facts he argues are in dispute. *Cf.* Fed. R. Civ. P. 56(c) and (e). The following facts are taken from a 911 call (Doc. 83-1), affidavits of Officers Traudt and Lara (Docs. 83-2, 83-3), a dispatch call (Doc. 83-4), a video statement by Ms. Eagle Feather (Doc. 83-5), a picture of the knife (Doc. 83-6), a deposition of a minor witness (Doc. 83-8), a video of the shooting (Docs. 83-7, 89-1), the expert report of Jeffery J. Noble (Doc. 83-9), police radio transmissions (Doc. 83-10), and the deposition of Carmelita Nichole Arellano-Black Elk (Doc. 83-11). The video of the shooting, which is relied upon by both parties, is the only evidence supplied by Plaintiff in this case.

had a protection order against him, and that he was wanted on two active arrest warrants: one for "assault, kidnapping, hit & run/domestic violence" and one for a failure to appear in a municipal case.

By that time, Sergeant Tim Hyatt had arrived and offered to check the apartment with Officers Lara and Traudt, which they did. But before they left, Carmelita Nichole Arellano-Black Elk informed them that Mr. Castaway had left the apartment, approached her car carrying a knife and threatened to kill her, and that he might have gone back inside.[2] Once inside the apartment, Officer Traudt observed signs of an altercation, including broken glass and the living room in disarray. Mr. Castaway was not there, and the officers returned to the Indian Center where Ms. Eagle Feather asked to press charges. After completing the interview, Ms. Eagle Feather asked the officers to accompany her back to her apartment to ensure that Mr. Castaway had not returned because she was afraid that he would return and kill her. Ms. Eagle Feather preferred to walk back to her apartment, so the officers planned to meet her there in their patrol car.

---

[2]    Ms. Arellano-Black Elk testified at deposition that her 13-year-old niece, who had driven with her to come pick up the kids at the apartment at Ms. Eagle Feather's request, "hopped in the car. She's all, Nina, roll up your window, shut your door right away. And I did. And [Mr. Castaway] went on my niece's side first to open the door. And then he walked around to my side and tried to open the door. And he was at the windshield, banging on it, talking stuff to me, saying he was going to kill me, and all kinds of stuff." (Doc. 83-11, at 31:13–18.) Ms. Arellano-Black Elk "informed [Officer Traudt] that Mr. Castaway had come out of the apartment and approached her car carrying a knife and that he might have gone back inside the apartment." (Doc. 83-2 ¶ 7.) Officer Traudt was also "advised by dispatch that [Ms. Arellano-Black Elk] had also called 911 because, based on Mr. Castaway's conduct, she was concerned for the safety of her children." (*Id.*)

As the officers were approaching her apartment, Ms. Eagle Feather pointed out Mr. Castaway across Morrison Road, and the officers drove to his location. As they started to get out of the car, Mr. Castaway saw them and started quickly walking away, eventually breaking into a run. Officer Traudt yelled, "Denver police. Stop." But Mr. Castaway ran into a nearby trailer park through an opening in a chain link fence. Officer Lara followed Mr. Castaway and Officer Traudt ran parallel along the fence line, then jumping the fence to enter the trailer park.

Officer Traudt noticed that Mr. Castaway was carrying a knife in his right hand, which he estimated to be twelve to eighteen inches long.[3] The officers ordered Mr. Castaway to drop the knife and get on the ground, but he instead put the knife to his own throat while "bobbing" in place. Officer Traudt drew his gun and yelled, "Drop the knife! Drop the knife! Drop the knife." Mr. Castaway responded, "Kill me, pussy. Kill me, you fucking pussy" about three or four times before turning and running away.

Officer Traudt re-holstered his weapon and again gave chase. Mr. Castaway paused briefly for a second time, but when Officer Traudt ordered him to drop the knife, Mr. Castaway did not comply and began running away again. During the pursuit, Officer Traudt noticed that children were present in the area, and he yelled for them to return to their homes.[4] Mr. Castaway ran around a corner, and behind a fence, and both officers lost sight of him.

---

[3]     Photos of the knife taken after the incident confirm that it was twelve inches long with a seven-and-one-half-inch blade. (Doc. 83-6.)

[4]     One of the children, Armando Anguiano Quiroz, thinking Plaintiff was running straight toward him, testified that he ran into a nearby

Officers Traudt and Lara drew their guns and, as they turned the corner and came within approximately ten feet of Mr. Castaway, he began advancing towards them with the knife held to his neck. Children ran to the area behind the officers. Officer Traudt immediately ordered Mr. Castaway to drop the knife and Officer Lara ordered him to get on the ground, but Mr. Castaway did not comply with either command. Officer Lara holstered his firearm to switch to his TASER, and Mr. Castaway began quickly walking toward Officer Traudt. Both officers continued backing up to create space while ordering Mr. Castaway to stop and to drop the knife.

Moving backward, Officer Traudt brushed into a garbage can and walked over a speed bump, which he describes as causing him to lose his footing and to feel like he might be running out of space to retreat. Mr. Castaway continued advancing, and when he was approximately five to six feet away,[5] Officer Traudt fired three shots in quick succession—all of which struck Mr. Castaway, who fell to the ground and died from his injuries.

The length of the interaction with Mr. Castaway, from the time the officers first radioed the foot chase until they radioed shots had been fired, was forty-two seconds.

---

laundromat for fear that Mr. Castaway might try to use him as a hostage. It is not asserted that Quiroz's fear was known to Officer Traudt at the time of the shooting, and the Court does not treat it as if it were.

[5] Officer Traudt states he believed Mr. Castaway had moved the knife away from his own throat, though this is not clear from the video evidence because Mr. Castaway is facing away from the camera.

# PROCEDURAL HISTORY

On June 11, 2016, Mr. Castaway's estate filed this action, by and through Ms. Eagle Feather, against the City and County of Denver, Officers Traudt and Lara in their personal and official capacities, and then-Police Chief Robert C. White in his personal and official capacities. (Doc. 1.) On October 10, 2016, Defendants moved to dismiss for failure to state a claim and on qualified immunity grounds. (Doc. 19.) On September 28, 2017, Judge Wiley Y. Daniel[6] granted the motion in part, dismissing the entire action except the excessive force claim brought pursuant to 42 U.S.C. § 1983 against Officer Traudt in his individual capacity. (Doc. 33.) The case was then delayed significantly while Mr. Castaway's estate obtained certain documentation from the Denver Probate Court. (*See* Docs. 63–67.) On September 12, 2019, Officer Traudt filed this motion for summary judgment on qualified immunity grounds. (Docs. 83, 89, 91.) The motion is ripe for review.

# ANALYSIS

## I.     Summary Judgment Standards

The purpose of summary judgment is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence

---

[6]     This case was reassigned to the undersigned on May 20, 2019 following Judge Daniel's passing.

presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145.

In deciding whether the moving party has carried its burden, courts do not weigh the evidence and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145. But neither unsupported conclusory allegations nor mere scintillas of evidence are enough to demonstrate a genuine dispute of material fact on summary judgment. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, a court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## II.    Qualified Immunity

Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." "Individual defendants named in a [Section] 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (cleaned up).

"Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quotations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

In this case, Officer Traudt argues both that he did not use unreasonable force in violation of the Fourth Amendment, and, even if he did, that the law was not clearly established such that he should have known that the amount of force he used was unconstitutional. Because the Court concludes that even viewing the facts in the light most favorable to the plaintiff, Officer Traudt's actions did not violate clearly established law, it does not address the parties' other arguments.

## III.  Clearly Established Law

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (alterations and internal quotation marks omitted). What is "clearly established" depends largely "upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).[7] Courts

---

[7]     It does not alter the outcome of this case, but it is worth noting that the Supreme Court has called into question circuit courts' definitive

must not define "clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S.Ct. at 552 (quoting *Anderson*, 483 U.S. at 640).

To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S.Ct. at 551 (quotation omitted). Although there need not be a "case directly on point," *id.* (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)), an "officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it.'" *City & Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (brackets omitted; quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)).

"The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S.Ct. at 308 (emphasis in original; quotations omitted). "Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White*, 137 S.Ct. at 552 (brackets and ellipsis omitted; quoting *Anderson*, 483 U.S. at 639). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743 (internal quotation marks omitted).

use of their own precedents as "clearly establishing" the law in a given context. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 665–66 (2012) ("Assuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case . . ."); *Carroll v. Carman*, 574 U.S. 13, 17 (2014) (citing *Reichle*, 566 U.S. at 665–66); *City & Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1776 (2015) (quoting *Carroll*, 574 U.S. at 17); *Kisela v. Hughes*, 138 S.Ct. 1148, 1152–53 (2018) (quoting *Sheehan*, 135 S.Ct. at 1775).

The Supreme Court has emphasized that particularly in excessive force cases, courts are required to pay "careful attention to the facts and circumstances of each particular case." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (Whether "an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."). The Court has repeated that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). Importantly, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396–97).

Plaintiff initially responds to this heavy burden by declaring that all police officers "are on notice that murdering suicidal suspects violates the Fourth Amendment." (Doc. 89, at 8.) This is just the sort of conclusory, generalized assertion that the Supreme Court "has repeatedly told courts" cannot govern qualified immunity cases. *Kisela*, 138 S.Ct. at 1152 (quoting *Sheehan*, 135 S.Ct. at 1775–76). Plaintiff gets closer to the mark in pointing to a line of Tenth Circuit cases—including *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015); *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006); *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989); and *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008). Plaintiff particularly focuses on *Tenorio*'s statement

that those cases "specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." *Tenorio*, 802 F.3d at 1165–66.

If that were the totality of the circumstances here, Plaintiff's position would be strong. But careful attention to the specifics of this case, as compared to those in the *Tenorio* line, reveals that the latter do not squarely support the conclusion "that any reasonable official in [Officer Traudt's] shoes would have understood that he was violating" the law. *Plumhoff*, 134 S.Ct. at 2023. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S.Ct. at 308 (internal quotation marks omitted). In excessive force cases, "the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "*squarely governs*" the specific facts at issue. *Id.* at 309 (emphasis in original; internal quotation omitted). None of the cases cited by Plaintiff squarely govern the situation faced by Officer Traudt.

In *Tenorio*, a relative had called 911 to report an intoxicated male holding a knife to his own throat. There was no evidence he had harmed or threatened anyone else at that time, although he apparently had a violent history. 802 F.3d at 1160. Officers were told he had been drinking and was "mad 'cause we took his beer away from him." *Id.* at 1162. When officers arrived, they entered the home and heard no raised voices or disturbance. *Id.* Mr. Tenorio walked into the room "at an average speed" with "a blank stare" and "carrying a santoku-style kitchen knife

with a three-and-a-quarter-inch blade . . . loosely in his right hand, his arm hanging by his side, as he walked behind his wife." *Id.* at 1163. When he was about two and one-half steps into the room, officers shouted to put down the knife four times, and then one officer shot him and another tased him. *Id.* "The commands and the shooting lasted two or three seconds." *Id.* The Tenth Circuit held that these facts were adequate to overcome a qualified immunity defense. *See id.* at 1166. It emphasized that Mr. Tenorio's version of the facts showed that he did not have enough time to comply with commands to drop the knife, made no hostile motions towards the officers, held the knife loosely at his side, was not in striking distance, and was not acting or speaking hostilely towards the officers or anyone else. *Id.*

In *Walker*, the court confronted a police shooting of a suicidal man. 451 F.3d at 1157–60. There, although there was a dispute about whether officers could have reasonably believed he had a gun, Mr. Walker had only a two-inch blade which, under his version of the facts, officers could and should have been able to see he was holding to his own wrist. *Id.* at 1160. In affirming denial of summary judgment based on qualified immunity, the court noted that officers were told that the decedent was suicidal but not homicidal, he had made no violent threats to anyone else, was not acting aggressively, had walked or jogged away from officers when confronted, and that officers were at least twenty-one feet away when they began shooting. *Id.* The officers issued no warnings before opening fire only twelve seconds after arriving on the scene. *Id.*

In *Zuchel*, the decedent created a disturbance at a McDonald's restaurant by kicking the front door and cracking its glass. 890 F.2d at 274. Before the police arrived, Mr. Zuchel left and exchanged words with four teenagers on bicycles. *Id.* As the exchange became more heated, Mr. Zuchel drew something from his pocket that the teenagers believed was

a knife. *Id.* As the officer approached the area, at least one of the teenagers yelled to the officer that the plaintiff had a knife. *Id.* As Mr. Zuchel approached the officer, the officer shot and killed him; the "knife" turned out to be a pair of fingernail clippers. *Id.* In affirming the district court's denial of summary judgment, the circuit noted that the Mr. Zuchel's version of the facts, which he had supported with witness testimony, included the following: The distance between the officer and Mr. Zuchel was approximately ten to twelve feet, and one witness testified that he "was clearly not close enough to stab" the officer. *Id.* at 275. Mr. Zuchel "was neither charging [the officer] nor stabbing at him." *Id.* He had "stopped and was trying to explain what was going on." *Id.* (internal quotation marks omitted). The other officer on scene testified that "she could not see any weapon in [Mr.] Zuchel's hand." *Id.* One witness heard the officer say, "shut up or you're going to die," while others heard no warning at all. *Id.* The circuit court upheld the trial court's determination that this version of the facts called into question the immediacy of the threat facing the officer and thus the legality of the use of force. *Id.* at 276.

*Estate of Larsen*, to which both parties cite, is a closer fit, and the court held that the officer in question did not use excessive force. 511 F.3d at 1263–64. Mr. Larsen had called 911 after midnight threatening to "kill someone or himself." *Id.* at 1258. Two officers drove to his house separately, approached the house from different directions, and confronted Mr. Larsen, who was standing above them on a porch and held a one-foot knife in his hand. *Id.* Seeing that Mr. Larsen was armed, both officers drew their pistols, identified themselves, and commanded him to put the knife down. *Id.* Mr. Larsen then raised the knife above his shoulder with the blade pointed outward and turned towards one of the officers, who was between seven and twenty feet away, and who again

told him to "drop the knife or I'll shoot." *Id*. Instead, Mr. Larsen turned and took a step towards that officer, who was on the sidewalk below. *Id*. Fearing for his life, the officer fired twice, hitting the Mr. Larsen in the chest and killing him, while the other officer held his fire. *Id*. at 1258–59. In upholding the district court's grant of summary judgment for the officer, the circuit concluded that the undisputed facts showed that Mr. "Larsen did make hostile actions toward [the shooting officer]. . . . [Mr.] Larsen ignored at least four police commands to drop his weapon and then turned and stepped toward the officer with a large knife raised in a provocative motion. Under these circumstances, [the officer] reasonably concluded [Mr.] Larsen posed an immediate threat to his safety." *Id*. at 1263. The court summarized that the undisputed evidence showed that the officers "were faced with an armed suspect who ignored repeated warnings to drop his weapon, and appeared willing and able to attack." *Id*. The court held that the plaintiff's "speculation and conjecture" that the officers "*might* have overreacted . . . is insufficient to show a constitutional violation." *Id*. at 1263–64 (emphasis in original).

The situation here is much more akin to *Estate of Larsen* than to the other cases Plaintiff cites. First, few, if any, of the relevant facts (rather than conclusions or characterizations of the facts) are disputed.[8]

---

[8]     Citing the Court's earlier ruling on Officer Traudt's motion to dismiss, Plaintiff begins by submitting that the Court has already ruled that a reasonable jury could find that "an objectively reasonable officer in Officer Traudt's position would not have believed that [Mr. Castaway] posed an immediate threat." (Doc. 89, at 2.) Therefore, Plaintiff appears to assume it is unnecessary to support that conclusion with facts at summary judgment. This is mistaken.

The Court's order denying the motion to dismiss was made with respect to a different legal standard governing "[that] stage of the litigation." (Doc. 33, at 13.) In considering a motion to dismiss, the Court is confined to the well-pleaded allegations in a complaint, must accept them as true, and determines only whether a plaintiff states a claim

Officer Traudt has provided video, audio, deposition, declaration, expert, and photographic evidence. Plaintiff, as noted above, has supplied only the video of the shooting. *See supra* n.1. It is undisputed that Officer Traudt was aware before he arrived that Mr. Castaway was not just suicidal, but that he had already (not merely threatened to but) poked his own mother with a knife. He was also told by Ms. Arellano-Black Elk that Mr. Castaway had approached her carrying a knife.

Officer Traudt was told of these events and eventually located Mr. Castaway running around a neighborhood full of children with a twelve-inch knife. The officer repeatedly commanded him to stop and drop the knife, but Mr. Castaway ignored these orders and actively resisted arrest by goading the officer to shoot him, before fleeing. When Officer Traudt caught up, Mr. Castaway emerged from behind a fence, walked briskly and directly toward him with a raised knife to his neck, still ignoring commands to stop and drop the knife, as the children scattered throughout the area took cover behind Officer Traudt and his partner. Officer Traudt began to retreat until he backed over a speed bump and nudged a trash bin in the alley, both of which he could not see. He did not fire until Mr. Castaway was five to six feet away and still advancing rapidly, a distance the expert evidence suggests Mr. Castaway could have covered in less than a second.[9] A child at the scene also testified he

---

plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court now must rely on the record—not mere allegations—to determine whether the Plaintiff has met its burden to show that Officer Traudt's use of deadly force was unreasonable under clearly established law. *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (At "summary judgment we are beyond the pleading phase of the litigation, [and] a plaintiff's version of the facts must find support in the record.").

[9]     With the current motion, Officer Traudt has provided the unrebutted expert report of Jeffery J. Noble. Mr. Noble opined that Plaintiff's

thought Mr. Castaway would grab him and use him as a hostage to bargain with the police.[10]

Plaintiff's response is largely an attempt to characterize the facts, not contest them. For example, Plaintiff calls Officer Traudt's stumbling as he backed over the speed bump "clumsy" and the fear of a suicidal subject "unreasonable." (Doc. 89, at 5, 7.) Plaintiff argues Mr. Castaway wasn't "in striking distance" at the time he was shot (Doc. 89, at 7), but the video of the incident shows exactly how far away he was from Officer Traudt, and he has offered no evidence to rebut the expert's conclusions concerning how much time it would take him to cover that ground. Plaintiff declares that Mr. Castaway "made no aggressive moves," "did not refuse to comply because he was given no time to comply," and "made no hostile motions toward the officers." (*Id.* at 7, 9.) There is no record support for these assertions, and the actual evidence contradicts them. These are not facts; they are the same sort of "speculation and conjecture" about what Officer Traudt could have done differently that the Tenth Circuit has held is inadequate to overcome a summary judgment motion. *See Estate of Larsen*, 511 F.3d at 1263–64.

---

6'2" stature means that he could have covered six to eight feet—the approximate distance between him and Officer Traudt at the time of the shooting—in a single step or a lunge and in less than one second. Because of this, Mr. Noble concluded that a de-escalation attempt, by using a Crisis Intervention Technique, would have been unfeasible. (*See generally* Doc. 83-9.)

[10] Plaintiff argues this is irrelevant, as Officer Traudt was unaware of the child's perspective at the time of the shooting. This misses the point, however. The testimony is not relevant to Officer Traudt's subjective beliefs, but others' fear is relevant to support the proposition that an objective observer would believe Plaintiff posed an imminent threat. Even without this testimony, however, the result would be the same, so this is not a material fact.

The only actually disputed fact is whether Mr. Castaway had begun to move the knife from his throat, as Officer Traudt stated he believed. This may be disputed,[11] but it is not material. Viewing the evidence in the light most favorable to the Plaintiff and assuming the knife was always at Mr. Castaway's own throat, the result is the same. Officer Traudt was faced with a situation in which it was objectively reasonable to use deadly force. *See id*. Viewing these facts without the benefit of hindsight, it was reasonable for him to believe that he and the children behind him were in at least as much danger, and faced a threat at least as immediate, if not more, than the officer in *Estate of Larsen*.

Mr. Castaway was shot forty-two seconds into the foot chase, during which he had multiple opportunities to obey commands to stop and drop the knife. He had already used the knife to threaten and assault his mother and made multiple aggressive and hostile moves and threats to others and to the officers. He ran with the knife into a crowded area, scattering children and others. It is undisputed that Mr. Castaway was approaching Officer Traudt, faster than the latter could retreat, with a knife raised at least to shoulder-level, and the officer had only seconds to react. The officer knew children and others were behind him, and when he stumbled and hit the trash bin, it was not unreasonable for him to think he either might trip or had limited room to retreat further.

---

[11]    The video shows that Plaintiff was moving toward Officer Traudt faster than the officer was backing up. Because Plaintiff's back is turned toward the camera, the Court cannot verify whether he moved the knife away from his own neck. (*See* Doc. 83-7, at 00:35–00:38.) One of the children who witnessed the shooting testified: "I think he had -- I think he had, like, a knife on his neck. . . . I think he was just, like, probably moving it up and down and stuff, but I can't remember if he actually, like, pointed it to the officers. I'm not too sure about that. But I think he had it on his neck and he was just playing with it up and down and stuff." (Doc. 83-8, at 17:13–18:8.)

While it is true that some facts of this case are similar to those in the *Zuchel-Walker-Tenorio* line, the totality of the circumstances is significantly different. The Court cannot say that those cases are so analogous to have "placed the statutory or constitutional question beyond debate." *White*, 137 S.Ct. at 551. Mr. Castaway's having already used the knife on someone else, his running into a crowded area, his refusal for nearly forty seconds to drop the knife, his sudden turn towards the officers and rapid approach, and the officer's backing up until stumbling before shooting all distinguish this case from those in which qualified immunity has been overcome. Given the quickly changing, unpredictable situation Officer Traudt faced, it cannot be said "that any reasonable official in his shoes would have understood that he was violating" the Constitution. *Sheehan*, 135 S.Ct. at 1774. At worst, Officer Traudt was operating in the "hazy border between excessive and acceptable force" in which qualified immunity protects officers from liability. *Saucier*, 533 U.S. at 206.

The Supreme Court's recent decision in *Kisela v. Hughes* further supports this conclusion. The circumstances the defendant officer confronted in that case were, if anything, less dangerous than those facing Officer Traudt. After a 911 call about a woman "hacking a tree with a kitchen knife," officers responded and were told by a witness that the woman had been acting erratically. 138 S.Ct. 1148, 1150–51. Ms. Hughes emerged from a house nearby "carrying a large knife at her side." *Id.* at 1151. She walked toward another woman (Ms. Chadwick), and stopped six feet from her. The officers, who were on the other side of a chain link fence, pulled their weapons and at least twice told Ms. Hughes to drop the knife. *Id.* Ms. Hughes "appeared calm, but she did not acknowledge the officers' presence or drop the knife." *Id.* Officer Kisela dropped to the ground to get a clear shot and fired four times,

striking Ms. Hughes. *Id.* It turned out that Hughes had a history of mental illness, that she and Ms. Chadwick had been arguing over a $20 debt, and that Ms. Hughes had been threatening to kill Ms. Chadwick's dog, but "officers knew none of this." *Id.*

The court of appeals held that the officer was not entitled to qualified immunity. The Supreme Court reversed, holding that "this is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id.* at 1153. The Court emphasized that where "the police believed (perhaps mistakenly), that the man posed an immediate threat to others" qualified immunity should attach. *Id.*

While a judicial decision that comes after an officer's actions cannot serve to "clearly establish" the law governing those prior actions, *see id.*, a United State Supreme Court decision holding that the law was *not* clearly established even in 2018 is, at the very least, instructive regarding what Officer Traudt should have known.[12] Indeed, *Kisela* is largely an application of a 1989 case, *Graham v. Connor*. As noted above, the Court there listed the major factors to consider in these cases as "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Each of those factors even more strongly weighs in favor of Officer Traudt than they did the officer in *Kisela*. Mr. Castaway had threatened and used a deadly weapon on his own mother and threatened numerous others, including children; this is undoubtedly a severe crime. His running into a crowded residential area, then quickly approaching

---

[12]     *Kisela* was issued in April 2018, so the Court did not have its guidance when it denied Officer Traudt's motion to dismiss.

officers with a knife (no matter where it was held) made it reasonable to believe he posed an immediate threat to the officers and others. And Mr. Castaway was also actively resisting arrest and attempting to evade arrest by flight.

Plaintiff here asks the Court to do precisely what the *Kisela* Court admonished the lower court for doing: taking a prior circuit decision denying qualified immunity and reading it "too broadly in deciding whether a new set of facts is governed by clearly established law." *Id*. at 1154. Just as in that case, it would be far too broad a reading of the *Tenorio* line of cases to hold that they make this an "an obvious case in which any competent officer would have known that shooting" Mr. Castaway would violate the Fourth Amendment. *See id*. at 1153.

That Mr. Castaway died in this way is undoubtedly a tragedy. But the question before the Court is not whether Officer Traudt could or perhaps even should have taken different action. That is the sort of hindsight-based speculation and conjecture that does not suffice to show a constitutional violation. The legal question is whether it was clearly established that the Constitution required him to do so, and the answer to that is no. Officer Traudt is therefore entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court determines that Officer Traudt is entitled to qualified immunity and **GRANTS** his motion for summary judgment (Doc. 83).

Dated: December 9, 2019.          BY THE COURT:

Daniel D. Domenico
United States District Judge